```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
JEFFREY WINTERS, as Administrator of the
Estate of LAURIE WINTERS, and JEFFREY
WINTERS, Individually,

                            Plaintiff,          MEMORANDUM AND ORDER

             - against -                        09 Civ. 4510 (NRB)

ALZA CORPORATION, SANDOZ, INC., and
SAXON CHEMISTS, INC. (d/b/a SAXON
PHARMACY),

                            Defendants.
----------------------------------------X
```

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Before the Court are the plaintiff's Motion to Remand and defendant DVS Pharmacy, Inc.'s ("DVS") Motion for Judgment on the Pleadings.[1]  For the following reasons, the plaintiff's Motion to Remand is denied, and DVS's Motion for Judgment on the Pleadings is granted.

---

[1] Saxon Pharmacy, one of the named defendants, has been owned and operated by DVS Pharmacy since June 2005 -- prior to the events at issue in this suit.  (Def. Mem. at 4.)  To avoid confusion, we refer to the pharmacy as "DVS" throughout this opinion.

## BACKGROUND[2]

The plaintiff, Jeffrey Winters, brings this suit on behalf of himself and his deceased wife, Laurie Winters. Jeffrey Winters is a resident of New York, and, before she passed away, his wife was also a resident of New York. (Amended Complaint ("Compl.") ¶¶ 1, 2.)

The plaintiff claims that his wife's death was the result of a design defect in a pain medication patch manufactured and marketed by two of the defendants -- Alza Corporation, which is organized under Delaware law and has its principal place of business in California, and Sandoz, Inc., which is organized under Colorado law and has its principal place of business in New Jersey. (Id. ¶¶ 3, 9.) The medication was dispensed to Mrs. Winters in accordance with her doctor's prescription by DVS, a corporation organized under New York law and with its principal place of business in New York. (Id. ¶ 15.)

In February 2007, the decedent was given a prescription by Dr. Bradley Cash for a name-brand transdermal patch known as Duragesic. (Pl. Mem. at 2.) The Duragesic patch delivers

---

[2] The following factual background and allegations are derived from the plaintiff's Complaint; a medical prescription incorporated by reference in the Complaint and provided to the Court by the parties; and representations made by the plaintiff's counsel at oral argument. For the purposes of these motions, the Court assumes the veracity of the plaintiff's allegations.

2

fentanyl, a pain-relieving drug, through the patient's skin. (Compl. ¶ 20.)

The Official New York State Prescription form used by Dr. Cash expressly stated that the prescription could be filled with a generic version of the drug unless otherwise noted in a box at the bottom of the slip. The box was not checked, indicating that the prescription could be filled with a generic version of the Duragesic patch. A pharmacist at DVS filled the decedent's prescription with a generic manufactured by Alza and marketed and distributed by Sandoz ("the Alza/Sandoz patch"). (Pl. Mem. at 2; Compl. ¶ 18.)

The plaintiff alleges that the Alza/Sandoz patch delivered a level of fentanyl to the decedent above the intended and designed level and that this heightened level of fentanyl caused his wife's death on February 28, 2007. (Compl. ¶¶ 23, 24, 29.)

The plaintiff attributes the problem with the Alza/Sandoz patch to a design flaw. The patch was made utilizing a "reservoir" design, meaning that fentanyl gel was inserted into a reservoir between two layers of the patch, which, the plaintiff alleges, allowed fentanyl gel to leak out. (Id. ¶ 22.) The plaintiff further claims that by the time the decedent had received the Alza/Sandoz patch, there had been at least one highly-publicized recall of Alza patches due to such leaks. (Id. ¶¶ 23, 26.)

The plaintiff additionally contends that there were alternatives to the reservoir design on the market at the time that the decedent received the Alza/Sandoz patch. (Id. ¶ 25.) These other types of patches employed "matrix" or "multi-laminate" designs, which, according to the plaintiff, did not leak fentanyl. (Id.)

The plaintiff also claims that when DVS dispensed the Alza/Sandoz patch to the decedent, the pharmacy "knew" (1) that the patch "was inferior or defective"; (2) that Alza "had manufactured leaking, defective fentanyl patches and distributed such patches to pharmacies such as [DVS] on multiple occasions"; and (3) that the design of the patch "was defective because of its susceptibility to leaks and that the design of the [Alza/Sandoz patch] was inferior to fentanyl patches utilizing the matrix or multi-laminate designs, which cannot leak." (Id. ¶ 69.) In essence, the plaintiff claims that the pharmacy sold to the decedent the inferior of two generic fentanyl patches. (Pl. Mem. at 3.)

Notably, the plaintiff concedes that the pharmacy filled the decedent's prescription as instructed by Dr. Cash. (1/13/10 Tr. at 3-4.) Further, the plaintiff does not allege that the pharmacy filled the prescription in a manner inconsistent with the manufacturer's prescribing information. Moreover, while the plaintiff contends that the manufacturing defendants failed to

4

provide the Federal Drug Administration ("FDA") with information that would have exposed defects and risks associated with the Alza/Sandoz patch, the plaintiff concedes that the product was FDA-approved at the time that DVS dispensed it to the decedent. (See Compl. ¶ 27; 1/13/10 Tr. at 4.)

The plaintiff originally filed his case in the Supreme Court of the State of New York on February 24, 2009. The defendants Alza and Sandoz removed the case to federal court on May 12, 2009, contending that DVS was fraudulently joined and that, without DVS as a defendant, this Court has diversity jurisdiction over the proceeding.

## DISCUSSION

### I. Diversity Jurisdiction and the Doctrine of Fraudulent Joinder

In order for a federal court to have subject matter jurisdiction premised on diversity jurisdiction, there must be "complete diversity" -- each plaintiff's citizenship must be different from the citizenship of each defendant. See, e.g., Hallingby v. Hallingby, 574 F.3d 51, 56 (2d Cir. 2009) (citing Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806)). The plaintiff here is a New York citizen, and because DVS's principal place of business is in New York, the pharmacy is also a New York citizen for jurisdictional purposes. See R.G. Barry

5

Corp. v. Mushroom Makers, Inc., 612 F.2d 651, 654 (2d Cir. 1979). The parties agree that if DVS is a proper party to the action, then its presence destroys diversity citizenship, deprives this Court of subject matter jurisdiction, and requires that the case be remanded to state court. See Pampillonia v. RJR Nabisco, Inc., 138 F.3d 459, 460 (2d Cir. 1998).

The defendants contend, however, that the plaintiff's Motion to Remand must be denied under the doctrine of "fraudulent joinder." This doctrine recognizes that "a plaintiff may not defeat a federal court's diversity jurisdiction and a defendant's right of removal by merely joining a defendant with no real connection to the controversy." Id. at 460-61. To show that a non-diverse defendant has been fraudulently joined, the defendant must show, by clear and convincing evidence, either (1) that there has been "outright fraud" or (2) that there is "no possibility, based on the pleadings, that [the] plaintiff can state a cause of action against the . . . defendant in state court." Id. at 461. The defendant seeking removal bears a heavy burden of proving

fraudulent joinder, and all factual and legal issues must be resolved in favor of the plaintiff. Id.[3]

The defendants here do not contend that there has been "outright fraud" in joining DVS but, rather, argue that it is legally impossible for the plaintiff to state a claim against DVS. When assessing the legal viability of a plaintiff's claim in this context, courts employ a standard that is more lenient to plaintiffs than the standard for a motion to dismiss. See, e.g., In re Fosamax Products Liab. Litig., MDL No. 1789(JFK), 2008 WL 2940560, at *3 (S.D.N.Y. July 29, 2008). If there is any doubt that the plaintiff has a tenable legal theory, the issue must be resolved in favor of the plaintiff. Id. Any possibility of recovery, however slim, weighs against a finding of fraudulent joinder and in favor of remand. Id.

## II. The Plaintiff's Claim Against DVS

The plaintiff's case against DVS hinges on whether he can state a claim that DVS was negligent in filling the prescription as written and dispensing the Alza/Sandoz patch to the decedent.

---

[3] Because the issue of fraudulent joinder is a jurisdictional inquiry, the Court is permitted to look beyond the pleadings and may review submissions from the parties such as affidavits. See, e.g., Sherman v. A.J. Pegno Constr. Corp., 528 F. Supp. 2d 320, 326 n.10 (S.D.N.Y. 2007) (collecting cases). We note, however, that our decision in this case is based only on our interpretation of the relevant law and on the factual representations made by the plaintiff in his Complaint, his motion papers, and at oral argument. DVS has provided an affidavit from an employee in support of the company's position, but we do not rely on it for the purposes of our ruling.

7

Based on the state of the law and on the plaintiff's allegations, we conclude that there is no legal possibility that he can do so.[4]

### A. The Law of Pharmacist Negligence in New York

As a general matter, pharmacists are charged with the duty to exercise "the highest practicable degree of prudence, thoughtfulness and vigilance and the most exact and reliable safeguards consistent with the reasonable conduct of the business." Willson v. Faxon, Williams, & Faxon, 208 N.Y. 108, 114, 101 N.E. 799 (N.Y. 1913). If a plaintiff can establish

---

[4] Although the plaintiff sued Alza and Sandoz on a variety of causes of action (including strict product liability, negligence, breach of express and implied warranties, and negligent misrepresentation), he has sued DVS only on claims of negligence, wrongful death, and loss of consortium due to the decedent's death. Given the absence of any briefing, from either party, on any cause of action apart from the negligence claim, we assume the parties are in agreement that the wrongful death and loss of consortium claims here are either directly derivative of the negligence claim or otherwise unsustainable.
 This accords with the relevant law in New York. In Liff v. Schildkrout, 49 N.Y.2d 622, 404 N.E.2d 1288 (N.Y. 1980), the New York Court of Appeals reaffirmed that there is no common law cause of action for wrongful death and that any such claim must be made under the state's wrongful death statute. 49 N.Y.2d at 631-32. That statute, in turn, provides that a decedent's personal representative can recover for "a wrongful act, neglect or default which caused the decedent's death against a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued." N.Y. Est. Powers & Trusts Law § 5-4.1. The Liff court also clarified that there is no common law cause of action for permanent loss of consortium and that damages for loss of consortium are not available under the state's wrongful death statute. 49 N.Y.2d at 632-34.

8

that his or her injury was the result of the pharmacist's breach of that duty, the pharmacist is liable for negligence.

A pharmacist generally cannot be held liable for negligence under New York law in the absence of an allegation that he either (a) failed to fill a prescription precisely as directed or (b) was aware that the customer had a condition rendering prescription of the drug at issue contraindicated. Fagan v. AmerisourceBergen Corp., 356 F. Supp. 2d 198, 212 (E.D.N.Y. 2004); In re N.Y. County Diet Drug Litig., 262 A.D.2d 132, 132-33, 691 N.Y.S.2d 501 (1st Dept. 1999). New York courts have also found pharmacists liable when there has been some "active negligence" -- for instance, when a pharmacist erroneously switches labels on medications or sells misbranded drugs. See Fagan, 356 F. Supp. 2d at 212 (collecting cases). But, as even the plaintiff here acknowledges, a pharmacist does not have a duty to inspect or test a prescription drug for latent dangers. Bichler v. Willing, 58 A.D.2d 331, 333, 397 N.Y.S.2d 57 (1st Dept. 1977) (cited in Pl. Mem. at 4).

B.  **The Plaintiff's Theory**

The plaintiff contends that DVS can be held liable because "New York law imposes a duty on a pharmacist to fill a prescription with the safer of two competing products." (Pl. Rep. Mem. at 1.) The plaintiff argues that this duty holds even if both products at issue are FDA-approved. (See 1/13/10 Tr. at

9

4-5.) According to the plaintiff, DVS violated its duty when it "knowingly" sold the decedent the Alza/Sandoz patch despite the availability of "another, safer, fentanyl patch on the market at the time." (Pl. Mem. at 1-2.)

The plaintiff, however, has failed to point to a single case in which any court has used his theory to find a pharmacy liable for negligence. Instead, he points to two cases -- Bichler, 58 A.D.2d 331, and Ullman v. Grant, 114 Misc. 2d 220, 450 N.Y.S.2d 955 (N.Y. Sup. Ct. 1982) -- in which courts dismissed negligence claims against pharmacies while noting that the plaintiffs had failed to allege that the prescriptions at issue were knowingly filled with inferior or defective products.[5] Bichler cites no authority for the suggestion (faint as it is) that a pharmacist can be held liable for dispensing a drug that is less safe than an available alternative, and the only authority directly cited by Ullman is Bichler itself.

Contrary to the contention of the plaintiff, these cases do not endorse his theory of liability, and the statements he relies upon are nothing more than *dicta*. Neither the Bichler

---

[5] See Bichler, 58 A.D.2d at 333 ("[I]n view of the absence of any showing of a difference between the [drug] chosen by the druggist and other available brands, his choice of the particular name brand of [drug] cannot be classified as negligence."); Ullman, 114 Misc. 2d at 221 ("A pharmacist is not negligent unless he knowingly dispenses a drug that is inferior or defective. No such allegation is alleged by the plaintiff.") (internal citations omitted).

10

court nor the Ullman court squarely addressed the issue before us today. The plaintiffs in those cases did not claim that there were superior substitutes on the market for the drugs that they received, and had they done so, the courts may very well have concluded (as we do) that there are insurmountable problems with holding a pharmacist liable on such facts. Indeed, the plaintiff has failed to locate a single case in any jurisdiction where a court has actually used his proposed theory to hold a pharmacy liable for negligence. If the plaintiff's claim were legally tenable, we might reasonably expect at least one court to have used his theory to hold a pharmacist liable, particularly since Bichler and Ullman -- which supposedly provide the foundation for his claim -- were decided roughly three decades ago.[6]

Moreover, it is difficult, if not impossible, to harmonize the plaintiff's theory with the longstanding law in New York that prevents lawsuits against doctors who authorize pharmacists to substitute generics for brand-name drugs. The "Generic Drug Laws," enacted in 1977, were designed "to make available to consumers cheaper generic drugs in lieu of more expensive brand

---

[6] At oral argument, one of the attorneys for the plaintiff also disclosed that his firm had brought similar actions for defective fentanyl patches throughout the country and that, in a small number of cases, pharmacies had been sued as well. (1/13/10 Tr. at 3.) He conceded that although his firm had proffered a similar theory of liability against the pharmacies in those cases, thus far no court has endorsed it. (Id.)

11

name drugs." Pharmaceutical Soc'y of the State of New York, Inc. v. Lefkowitz, 454 F. Supp. 1175, 1178 (S.D.N.Y. 1978). The law requires the State Commissioner of Health to create a list of FDA-approved generic drugs that have not been identified as having any actual or potential bioequivalence problems. N.Y. Pub. Health Law § 206(1)(o). Unless a doctor's prescription indicates otherwise, pharmacists are required to fill prescriptions with generic drugs that are less expensive than their brand name counterparts. N.Y. Educ. Law § 6816-a(1). By statute, doctors cannot be held civilly liable for "authorizing . . . the substitution by a pharmacist of" a generic drug from the Commissioner's list. N.Y. Educ. Law § 6810(6)(d).

In other words, it appears that New York law would not permit the plaintiff to sue Dr. Cash, who actually wrote the prescription for the decedent and could have specified that she receive a specific brand of fentanyl patch. Nevertheless, the plaintiff would have us hold DVS liable for filling Dr. Cash's prescription within the parameters that he legally set out. The plaintiff has failed to provide any principled argument that

12

would support this differential result.[7]  It is reasonable to conclude that a doctor, particularly a specialist, will have greater knowledge with respect to the drugs relevant to his area of expertise than can be attributed to a pharmacist, whose work entails the universe of medications.

The plaintiff's theory of liability also lacks a convincing public policy rationale.  Cf. Bocre Leasing Corp. v. General Motors Corp., 84 N.Y.2d 685, 693, 645 N.E.2d 1195 (N.Y. 1995) (declining to create a new rule of tort liability in part because of the "lack of a substantive public policy purpose to be furthered").  By asking that pharmacies ensure the complete safety of any product that they dispense -- even when the defect at issue is the result of an intrinsic design flaw -- the plaintiff would have us place pharmacies on par with drug

---

[7] Dr. Cash's immunity from suit presumably explains why he was not joined as a defendant in this case, an issue that the Court repeatedly inquired about at oral argument.  (See, e.g., 1/13/10 Tr. at 4, 10.)  Yet despite repeated questioning -- and despite a representation from one of the plaintiff's attorneys that she had been practicing in the area of medical malpractice for over 20 years -- neither of the lawyers representing the plaintiff disclosed the existence of N.Y. Educ. Law § 6810(6)(d).  This provision, discovered by the Court as a result of its own research, has a very direct and obvious bearing on the issues before the Court.

It is well-established in New York that each lawyer has an ethical obligation to disclose to courts "controlling legal authority known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel." N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.0, Rule 3.3(a)(2). Given the incomplete representations made by the attorneys for the plaintiff, the Court hereby orders counsel to show cause why they should not be referred for disciplinary action.

manufacturers for the purposes of tort liability.[8] This is not only wrong as a matter of law,[9] but it would also impose a duty on pharmacists that is grossly disproportional to their limited degree of expertise -- which entails competently dispensing drugs as directed, with appropriate instructions for customers, while monitoring for potential contraindications.

The plaintiff's theory of liability also requires every pharmacist to act as a sort of shadow FDA, making decisions about what types of drugs are and are not safe for the public as a general matter. There is simply no reason to believe that pharmacists are -- or should be -- equipped to make those sorts of decisions, and asking them to do so would entail a dramatic expansion of their duties under tort law.

The plaintiff here does not allege that the pharmacist failed to follow the doctor's prescription or the manufacturer's prescribing information, and he concedes that the drug dispensed to the decedent was FDA-approved. Under these circumstances, we

---

[8] Indeed, counsel for the plaintiff conceded at oral argument that under his theory, in a situation in which a pharmacy dispensed an allegedly defective medication in accordance with a doctor's prescription, he could conceive of no scenario in which the pharmacy, but not the manufacturer, would be liable. (1/13/10 Tr. at 13.)

[9] See, e.g., Negrin v. Alza Corp., No. 98 Civ. 4772(DAB), 1999 WL 144507, at *5 (S.D.N.Y. Mar. 17, 1999) ("under New York law, it is clear that a pharmacist is not liable to the same manner or degree as the manufacturer of [a] drug").

14

see no valid reason for finding that the company could be negligent for inadequately second-guessing the FDA.

We therefore conclude that there is no possibility, based on the pleadings, that the plaintiff can state a claim for negligence against DVS in state court. Accordingly, the plaintiff's Motion to Remand is denied, and defendant DVS is dismissed from this action.

### III. The Effect of DVS's Dismissal

We close with a note to clarify the effect of DVS's dismissal. At oral argument, counsel for the plaintiff contended that any dismissal should be without prejudice to the plaintiff renewing his case against DVS in state court. (1/13/10 Tr. at 17-19.) Because this argument was never made in the plaintiff's briefs, there has been literally no legal authority adduced in support of it. Rather, counsel for the plaintiff contended that if the Court were to deny plaintiff's Motion to Remand, DVS would be immediately dismissed from the action and its Motion for Judgment on the Pleadings would therefore be moot, which would prevent the Court from ruling on it. (Id.) While there is a certain tidiness to this cramped, formalistic reasoning, we do not accept it.

We draw guidance from the Second Circuit's decision in Pampillonia v. RJR Nabisco, Inc., 138 F.3d 459, 460-62 (2d Cir. 1998). In that case, the Court of Appeals affirmed a district

15

court decision that denied a motion to remand based on the doctrine of fraudulent joinder and simultaneously granted the fraudulently-joined defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted. A dismissal pursuant to Rule 12(b)(6) is, of course, a dismissal with prejudice. See, e.g., Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1187 (2d Cir. 1996) ("a dismissal under Rule 12(b)(6) is a dismissal on the merits of the action"). There is an obvious logic to this result: if, in analyzing a fraudulent joinder issue, a federal court concludes that there is no legal possibility for a plaintiff to state a particular claim against a defendant, it would make little sense and would result in a waste of judicial resources to permit the plaintiff to try again in state court.

Here, DVS opted to answer the plaintiff's complaint and to subseqeuently move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The plaintiff has offered no rationale for treating DVS's motion pursuant to Rule 12(c) differently from a motion pursuant to Rule 12(b)(6) in this context, and it would be peculiar to do so considering that the two are functional equivalents. See Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001) ("The standard for granting a Rule 12(c) motion for judgment on

16

the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim.").

We therefore dismiss the plaintiff's negligence claim against DVS with prejudice.

## CONCLUSION

For the foregoing reasons, the plaintiff's Motion to Remand (docket no. 12) is denied, and DVS's Motion for Judgment on the Pleadings (docket no. 13) is granted. The defendant DVS (sued as Saxon Chemists, Inc.) is hereby dismissed from this action, and the remaining parties are directed to submit a proposed discovery schedule by February 26, 2010.

Dated:   New York, New York
         February 4, 2010

                                        NAOMI REICE BUCHWALD
                                        UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been mailed on this date to the following:

**Attorney for the Plaintiff**
Christopher R. LoPalo, Esq.
Napoli Bern Ripka & Associates LLP
35000 Sunrise Highway, Suite T-207
Great River, NY 11739

**Attorney for Defendant**
John D. Winter, Esq.
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036